**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| AFRAH TALPUR<br>222 Winged Food Drive<br>Blue Bell, PA 19422 | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | No.:_____ |
| | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| ST. JOSEPH REGIONAL<br>HEALTH NETWORK<br>d/b/a Penn State Health St. Joseph<br>d/b/a St. Joseph Medical Center<br>2500 Bernville Road<br>Reading, PA 19605<br>    and<br>PENN STATE HEALTH<br>100 Crysal A Drive<br>Hershey, PA 17033 | : | |
| Defendants. | : | |

**CIVIL ACTION COMPLAINT**

Afrah Talpur  (hereinafter referred to as "Plaintiff," unless indicated otherwise) by and through her undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1.    Plaintiff has initiated this action to redress violations by St. Joseph Regional Health Network d/b/a Penn State Health St. Joseph d/b/a St. Joseph Medical Center and Penn State Health (hereinafter collectively referred to as "Defendants") of Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 2000d *et. seq*.)/the Pregnancy Discrimination Act ("PDA"), the

Pennsylvania Human Relations Act ("PHRA")[1] and other Pennsylvania state and common law. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws.  There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3.      This Court may properly assert personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4.      Pursuant to 28 U.S.C. § 1392(b)(1) and (b)(2), venue is properly laid in this district because Defendants are deemed to reside where they are subjected to personal jurisdiction, rendering Defendants residents of the Eastern District of Pennsylvania.

5.      Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Plaintiff has properly exhausted her administrative proceedings before initiating this action by timely filing her Charge with the EEOC, and by filing the instant lawsuit within 90 days of receiving a right-to-sue letter from the EEOC.

---

[1] Plaintiff will move to amend her instant lawsuit to include claims under the PHRA once her administrative remedies are fully exhausted with the Pennsylvania Human Relations Commission ("PHRC"). Any claims under the PHRA would mirror her instant federal claims.

2

**PARTIES**

6.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7.    Plaintiff is an adult individual, with an address as set forth in the caption.

8.    St. Joseph Regional Health Network d/b/a Penn State Health St. Joseph d/b/a St. Joseph Medical Center ("St. Joseph," if referred to individually) is an acute care hospital which serves the Berks region with outpatient and inpatient diagnostic, medical and surgical services.

9.    Plaintiff was hired by St. Joseph pursuant to a Physician Employment Agreement dated September 3, 2024 (hereinafter "Agreement"). *See* Exhibit A.

10.    The Agreement sets forth, *inter alia,* that St. Joesph is affiliated with Penn State Health ("PSH," if referred to individually); that Plaintiff was required to follow the policies and procedures of PSH; that Plaintiff's employment was in fact governed by same; all notices under the Agreement governing Plaintiff's employment were to be directed to PSH; that if Plaintiff failed to provide proper termination notice she would be "ineligible for *rehire with Penn State Health*" (emphasis added); and the email terminating Plaintiff's employment stated that "your employment with Penn State Health will be terminated…."

11.    Upon information and belief, Defendants were run as a joint operation and enterprise with employees moving from one entity to another, sharing facilities, with operations being conducted as if a single enterprise.

12.    Because of their interrelation of operations, common ownership or management, centralized control of labor relations, common ownership or financial controls, and other factors, Defendants are sufficiently interrelated and integrated in their activities, labor relations,

ownership, and management that they may be treated as a single and/or joint employer for purposes of the instant action.

13. At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## FACTUAL BACKGROUND

14. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

15. Plaintiff is a physician who has been board certified in internal medicine since 2022 and she specializes in Hospital Medicine.

16. Pursuant to the Agreement referenced *supra,* Plaintiff was offered employment by Defendants on or about September 3, 2025, as a Physician.

17. Plaintiff executed the Agreement and commenced employment with and for Defendants in January of 2025.

18. In total, Plaintiff was employed by Defendants for approximately eleven (11) months.

19. While working for Defendants, Plaintiff reported to management including but not limited to Priya Amin, D.O. ("Amin" – Chief Hospitalist); Alysson Robitzer ("Robitzer" - Practice Manager); and Kimberly Wolf, D.O. ("Wolf" – Vice President of Medical Affairs).

20. Plaintiff abruptly terminated by Defendants effectively on or about December 12, 2025.

21. As of Plaintiff's termination from employment, Plaintiff was three (3) months pregnant, which was known to and shared with Plaintiff's management.

4

22.    Prior to Plaintiff's unwarranted termination, she had not received any discipline, performance improvement plans, or other documentation that could be considered disciplinary before being informed of termination.

23.    Instead, Plaintiff received a letter dated December 12, 2025, from Wolf which stated in pertinent part:

> Dear Dr. Talpur,
>
> This letter serves as documentation of our meeting today. Due to ongoing performance issues, your employment with Penn State Health will be terminated effectively immediately consistent with subsection 7.b of your employment agreement.

24.    In accordance with the Agreement, Plaintiff's term was to be "three (3) years." If Defendants desired to terminate Plaintiff's employment *without cause*, Plaintiff was to be terminated only upon receiving "one-hundred and eighty (180) days' advanced written notice." *See* ¶ 7(C) of the Agreement, Exhibit A.

25.    Defendants terminated Plaintiff without cause and without providing "one-hundred and eighty (180) days' advanced written notice."

26.    This breach of contract alone caused Plaintiff a loss of $66,250.00 (180 days' notice), inclusive of other financial losses, the harm to Plaintiff's reputation, and the inability to transition to a subsequent employer without a gap in employment.

27.    Instead, Defendants informed Plaintiff (without prior warning or opportunity to cure) that her termination was effective "immediately" on December 12, 2025, without specific detail of the 7(b) rationale for termination (beyond generically summarizing "performance").

28.    In addition to the Agreement being breached and Plaintiff being owed 180 days' of notice (for breach of contract), Plaintiff was also terminated in violation of Title VII and the PHRA

5

for being terminated shortly after pregnancy and maternity leave dialogue, which were determinative factors in Plaintiff's pretextual termination.

29. For example, approximately two (2) months prior to her termination, Plaintiff discussed her pregnancy and anticipated maternity leave with Robitzer.

30. In or around the same timeframe, Plaintiff also discussed same with Amin and requested that her on-call days be reduced. Amin was hostile and dismissive of Plaintiff's request, as well as the discussions about her pregnancy and need for leave.

31. Shortly after Plaintiff discussed her pregnancy and maternity leave with Amin, Plaintiff's schedule was changed, and her on-call days were actually *increased* to two (2) days per week. However, the non-pregnant physicians had one (1) or even no on-call days per week.

32. Less than two (2) weeks before Plaintiff's termination, Plaintiff needed to leave early for an OB/GYN visit related to her pregnancy. Plaintiff signed out of work, and informed the on-call physician, Dr. Green.

33. While Plaintiff was attending her medical appointment, Amin called Plaintiff; questioned Plaintiff why she left early; falsely accused Plaintiff of leaving without telling anyone; and then abruptly ended the call when Plaintiff explained that she had properly signed out and was attending a medical appointment related to her pregnancy.

34. Other physicians, who were not pregnant, have received written warnings, PIP plans, and other documentation evidencing a performance concern to correct. Plaintiff, however, was never provided with such opportunities.

35. Plaintiff was clearly treated disparately. Instead of being provided with any notice or opportunity to cure any alleged performance concerns, Plaintiff was presented with an unsolicited "Severance Agreement and General Release" in conjunction with her termination,

which would have permitted Plaintiff to treat her separation as a "resignation" if she agreed to waive all legal claims (among other terms and conditions).[2]

36.     This is also an example of differential treatment for an employee allegedly terminated for "cause."

37.     Plaintiff believes and therefore avers that ongoing dialogue about her pregnancy/ pregnancy related needs and disclosures of anticipated need for maternity leave were determinative factor(s) in her termination.

38.     Furthermore, Defendants' failure to properly pay Plaintiff all required compensation under the Agreement constitutes a breach of contract and a violation of the WPCL.

**Count I**
**<u>Violations of Title VII/PDA</u>**
**(Pregnancy Discrimination)**

39.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

40.     Approximately two (2) months before her termination, Plaintiff informed Defendants' management that she was pregnant and that she intended to take maternity leave.

---

[2] *See Staffieri v. Northwestern Human Servs.*, 2013 U.S. Dist. LEXIS 72115 at **14-15 (E.D. Pa. 2013)(an employer who offered severance at when policies did not require upon condition of waiving claim supported finding of pretext among other facts); *Bartlett v. NIBCO Inc*., 2011 U.S. Dist. LEXIS 28072 (N.D. Ind. 2011)(finding that a severance agreement offered contemporaneously to when the employee was terminated was "probative on the issue of whether NIBCO's motive for terminating Bartlett was [false]."); *EEOC v. Republic Servs., Inc*., 640 F. Supp. 2d 1267 (D. Nev. 2009)(denying summary judgment and considering as evidence in wrongful termination case that a company would offer severance when an employee is supposedly terminated in a manner that doesn't warrant severance per an explicit company policy); *Karl v. City of Mountlake Terrace,* 2011 U.S. Dist. LEXIS 59085 (W.D. Wash. 2011)(severance agreements are admissible in retaliation claims when made contemporaneous to termination, as they are not governed by Fed.R.Evid. 408); *Brandy v. Maxim Healthcare Servs., Inc*., 2012 WL 5268365, at *2 (N.D. Ind. 2012)(holding that severance agreements offered at the time of termination do not fall under Rule 408 because they are offered before a dispute arises, regardless if the employer "anticipated the severance agreement curtailing any potential future litigation.").

41.    ***Less that two (2) weeks*** after Plaintiff apprised Defendants' management that she needed to leave work early to attend a medical appointment related to her pregnancy (set forth *supra*), Plaintiff was abruptly terminated.

42.    Defendants subjected Plaintiff to hostility and animosity, overall treating her in a very derogatory and demeaning manner, as a result of her pregnancy/anticipated leave.

43.    Plaintiff's pregnancy/anticipated leave was undeniably a motivating or determinative factor in Defendants' termination of her employment.

44.    Plaintiff is a single mother and, following her unlawful termination, Plaintiff sustained substantial losses in the form of having to pay for her medical expenses out-of-pocket, following the loss of her medical insurance. Plaintiff also sustained significant emotional distress damages during her high-risk pregnancy as a result of her wrongful termination.

45.    Defendants' actions in terminating Plaintiff constitute violations of Title VII/PDA.

### Count II
### Violation of the Pennsylvania Wage Payment Collection Law
### ("WPCL") (43 P.S. 260.3(a)(b))

46.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

47.    Plaintiff had an agreement with Defendants whereby Defendants agreed to compensate Plaintiff for all services she performed during her employment.

48.    Defendants failed to compensate Plaintiff for all wages owed during her employment.

49.    Plaintiff performed the agreed-upon services for Defendants, and Defendants failed to properly compensate Plaintiff for the services rendered as specified by the Parties' Agreement.

50.     Defendants' failure to properly compensate Plaintiff $66,250.00 (180 days' notice) upon her termination constitutes a violation of the Pennsylvania WPCL.

51.     As a consequence of Defendants' violation of the Pennsylvania WPCL, Plaintiff has suffered damages.

52.     Plaintiff is also entitled to liquidated damages, costs and attorneys' fees.

53.     These actions as aforesaid constitute violations of the Pennsylvania WPCL.

### Count III
### Breach of Contract

54.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

55.     Plaintiff entered into the Agreement with Defendants, which amounts to an enforceable contract, wherein if Defendants desired to terminate Plaintiff's employment *without cause*, Plaintiff was to be terminated only upon receiving "one-hundred and eighty (180) days' advanced written notice." *See* ¶ 7(C) of the Agreement, Exhibit A.

56.     Plaintiff provided good and valuable consideration in performing all work required her under the Agreement.

57.     The Agreement has been breached by Defendants' termination of Plaintiff without cause and without providing "one-hundred and eighty (180) days' advanced written notice."

58.     This breach of contract alone caused Plaintiff a loss of $66,250.00 (180 days' notice), inclusive of other financial losses, the harm to Plaintiff's reputation, and the inability to transition to a subsequent employer without a gap in employment.

59.     Plaintiff has clearly suffered damages as a result of Defendant's breach of the Agreement.

60.     These allegations as aforesaid constitute violations of Pennsylvania's common law

9

doctrine of Breach of Contract.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    Defendants are to promulgate and adhere to a policy prohibiting discrimination in the future against any employee(s);

B.    Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C.    Plaintiff is to be awarded punitive and/or liquidated damages as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

D.    Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E.    Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.    Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:

Ari R. Karpf, Esq. (Attn. No. 91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
(215) 639-0801
akarpf@karpf-law.com
*Attorneys for Plaintiff*

Dated: May 26, 2026

11

# Exhibit A

## PHYSICIAN EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** ("Agreement"), offered this 3rd day of September, 2024, and effective as of the last date entered on the signature page hereto ("Effective Date"), is by and between **St. Joseph Medical Group** ("Group"), and **Afrah Talpur, M.D.** ("Physician").

## BACKGROUND

A.    Group is affiliated with Penn State Health ("PSH"), a healthcare system which operates hospitals, health care facilities (collectively, "Facilities"), clinics and provides healthcare services across the central Pennsylvania region ("Region").

B.    Group, in furtherance of its charitable mission, supports and operates Facilities and medical offices in various locations—including the Penn State Health St. Joseph Medical Center— in order to improve the availability of quality clinical services to residents within the Region.

C.    Physician is duly licensed to practice medicine in the Commonwealth of Pennsylvania, and specializes in the field of hospital medicine.

D.    Group desires to employ Physician and Physician desires to be employed by Group, all as set forth herein.

In consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the parties, intending to be legally bound, and incorporating the foregoing statements below as a material part of this Agreement, agree as follows:

## TERMS

1.    **Exclusive Employment.**  Subject to the terms and conditions set forth herein, Group agrees to employ Physician to provide professional medical and administrative services and Physician accepts such employment.  During the Term (as hereinafter defined), Physician shall work on an exclusive basis for Group as a **0.5** full time equivalent ("FTE"), and shall not provide any professional medical, expert witness, administrative or other compensated or professional services on behalf of any other individual or entity without the prior written consent of Group. Physician shall devote Physician's best efforts to fulfill Physician's obligations hereunder, and shall not engage in any activity which constitutes, or could reasonably constitute, a conflict of interest to Group or its affiliates, and will uphold Physician's duty of loyalty and care to Group. Unless otherwise expressly defined herein, the terms "affiliate," and/or "affiliates" shall include any entity or organization owned, controlled or operated, in whole or in part, by PSH, at the time this Agreement was executed, and any time thereafter, and includes PSH itself.  Physician's employment under this Agreement is expected to commence on or about **January 12, 2025** (the "Start Date"[1]), with clinical services commencing on or about that same date.  The Start Date

---

[1] The Start Date must not occur before the Effective Date set forth above.  If it does, the Start Date shall automatically be the later-occurring Effective Date.

Afrah Talpur, M.D.   Physician Employment Agreement
Page 1 of 19

shall not occur until Physician has successfully completed any requisite pre-employment requirements and satisfied all of the conditions of employment set forth in this Agreement ("Pre-Employment Conditions"), which include, but are not limited to, credentialing and clinical privileging.  In the event that the Pre-Employment Conditions have not been satisfied or waived on or prior to the Start Date, Group may terminate this Agreement with no further obligation to Physician.

2.      **Services, Location, and Coverage.**  At the direction of Group, Physician shall provide clinical duties at locations assigned by Group, consistent with Physician's specialty that are commensurate with professional medical services normally and customarily performed by a physician practicing in the same specialty as Physician.  In addition, Physician will perform administrative duties as reasonably assigned from time to time by Group.  For specialties where call coverage is required, Physician, together with other physicians employed by Group, shall make arrangements to provide full call duty coverage for Group's patients; call coverage for Group's patients will be assigned proportionately within an applicable call coverage group unless agreed to otherwise by all such applicable Group physicians, or unless otherwise set forth expressly in Exhibit A hereto.  Physician and Group agree to work in earnest and in good faith to maximize the efficiency around office, clinic, and surgery scheduling and utilization, as clinically appropriate.

3.      **Physician's Representations, Warranties & Covenants.**  Physician hereby makes and affirms to Group the representations, warranties and covenants in this Section 3, which shall be true, correct and complete on the execution date of this Agreement and on the Start Date, and are required to be true, correct and complete throughout the Term; and if at any time during the Term they are no longer true, correct or complete, Physician agrees to notify Group in writing immediately.

        a.      <u>Licensure & Certification</u>.  On or prior to the Start Date, Physician (i) holds a current valid and unrestricted license to practice medicine in the Commonwealth of Pennsylvania; (ii) holds a current valid and unrestricted Drug Enforcement Administration ("DEA") Registration Number and applicable state permit; and (iii) is board certified in Physician's specialty or Physician is board eligible and will become board certified during the Initial Term (as hereinafter defined). Physician shall immediately deliver to Group, upon receipt, any final decision or pending or threatened action adverse to any of the aforementioned licenses, registrations or certifications, or if not in writing, notify Group immediately.  Physician is the sole individual responsible for providing this information to the Group, even where any final decision or pending or threatened action adverse to any of the aforementioned licenses is a public record.  Physician agrees that Group may access any data bank or other source of information in order to verify Physician's compliance with these requirements and/or any similar or related policy requirements.

        b.      <u>Patient Assignments</u>.  Physician recognizes that Group will have complete authority with regard to the acceptance for treatment of or the refusal to treat any patient and shall have complete authority with regard to the establishment of the appropriate fee for professional services, including guidelines of third-party payers.  Group will control the assignment of patients.  Such determination will be made by Group.  Physician agrees to care for such patients as are assigned to Physician and recognizes that patients treated by Physician may be subsequently assigned to other physicians and employees of Group or affiliates, all in

Afrah Talpur, M.D.   Physician Employment Agreement
Page 2 of 19

accordance with and subject to the applicable ethical standards and requirements with regard to the practice of medicine.

c.    Third-Party Payor Status.  Physician shall cooperate with and assist Group in enrolling or remaining as a participating provider with Highmark, Capital Blue Cross, Aetna, Medicare, Medicaid and any other payors as reasonably requested by Group.  Physician agrees to accept assignment of Medicare benefits from Medicare beneficiaries.  Physician shall not enter into or renew any payor contracts for which services under this Agreement may be payable unless Group authorizes such participation.  Physician shall obtain and maintain any and all credentialing required by third party payors.  In addition, Physician must participate in any quality assurance, utilization management or similar programs required by Group or any third party payor and will attend any such meetings scheduled by or otherwise deemed reasonably necessary by Group.  Physician hereby authorizes each Facility, hospital and/or other health care facilities at which Physician has medical staff membership or clinical privileges, and any other entity or organization, to make copies of Physician's credentials file, the application form and all attachments and addenda thereto, including copies of Physician's current state licensure and specialty board certifications, all letters of reference, a description of Physician's delineated privileges and any other information contained therein, and to provide such copies to Group for use in the credentialing process.  Physician hereby releases any such Facility, hospital, healthcare facility and/or other entity or organization, its trustees, officers, employees, agents, affiliates and medical/dental staff from any and all liability whatsoever in providing such information to Group. Further, Physician hereby releases Group, its shareholders, directors, officers, employees, agents and affiliates from any and all liability whatsoever in providing such information to payors.

d.    Medical Staff Membership.  Physician shall maintain or obtain appropriate medical staff membership and clinical privileges at the Facilities, as determined by Group. Physician may be required to obtain membership or privileges at other hospitals and other health care facilities as mutually agreed upon by Group and Physician from time to time.  Physician agrees to notify Group immediately of, and that Group may have access to any information relevant to, any actions and allegations against or involving Physician's medical staff membership(s) and/or clinical privileges at any and all Facilities or other hospitals or facilities (provided such access is in accordance with applicable law). Physician also agrees to execute any consents and/or releases necessary for access or communication between Group and the relevant health care institution regarding any such actions and allegations.

e.    Sanctioned Person.  Physician is not now and at no time has Physician been excluded or suspended from, or sanctioned in any manner in connection with, any state or federally funded health care program, including Medicare and Medicaid (collectively referred to as "governmental health care programs").  Physician agrees to immediately notify Group of any threatened, proposed, or actual exclusion of Physician from participation in any governmental health care program during the Term of the Agreement, even if the requested information is a public record.  Physician agrees to indemnify and hold Group harmless against all actions, claims, demands, and liabilities, and against all loss, damage, costs, and expenses, including reasonable attorneys' fees, arising directly or indirectly out of any violation of this Section by or due to Physician's exclusion from a governmental health care program.

f.    No Violation of Other/Prior Contracts.  Physician is not subject to or bound by any noncompetition, restrictive covenant or other agreement or legal obligation that would be violated or contravened by Physician's execution of this Agreement or that would impede or interfere with the performance of Physician's duties and responsibilities under this Agreement. To the extent this statement is not accurate, and litigation relating in any way to Physician's prior contractual or other legal obligations is asserted or threatened against Group or affiliates, Physician shall indemnify Group and/or affiliates for any and all damages, losses, including but not limited to amounts paid in settlement, attorneys' fees, and all costs flowing from such litigation or threatened litigation.

g.    Compliance with Laws; Abide by Group's Policies, Etc.  Physician agrees to perform all services hereunder in compliance with all applicable laws, rules and regulations, including without limitation, all patient privacy (including HIPAA), anti-fraud and abuse and physician self-referral laws, prescribing laws, standards and requirements of any national or local supervisory boards, the applicable canons of professional ethics as well as all applicable written policies, regulations, and protocols established by Group from time to time and provided to, or otherwise made available to, Physician in advance.  Physician shall promptly report to Group any use or disclosure of a patient's Protected Health Information not provided for by this Agreement or in violation of HIPAA, the Federal Privacy Regulations, or the Federal Security Regulations. Physician shall comply at all times with Group's policies and procedures and, to the extent applicable, the policies and procedures of Penn State Health, and the applicable policies and procedures (including but not limited to the Ethical and Religious Directives for Catholic Healthcare applicable to St. Joseph Regional Health Network and Holy Spirit Hospital) of any of Group's affiliates where Physician provides services.  Nothing in any of Group's policies, rules, regulations, protocols, or employee handbook, if any, shall be construed to create an employment contract for a specific time or to create any rights in favor of Physician that are contrary to the provisions of this Agreement.  Group's policies may refer to and/or incorporate policies of Penn State Health and/or its affiliates, and any reference to "policies" herein (whether singular or plural) shall include all such polices.

h.    Medical Records.  Group shall have custody of and shall be the sole owner of all medical records concerning all patients treated pursuant to this Agreement.   Physician shall ensure competence with Group's electronic medical records system, and shall timely and promptly complete any and all medical records/charts and other information necessary for compliant billing by Group, both during and immediately after the Term (if not completed during the Term).

i.    Litigation, Claims and Investigations.  Physician has not been, and is not as of the date signed below, and will not be prior to the Start Date, subject to (i) any malpractice suit, claim (whether or not filed in court), settlement, settlement allocation, judgment, verdict or decree against Physician that has not been disclosed previously to Group in writing; (ii) nor any disciplinary, peer review or professional review investigation, proceeding or action instituted against Physician by any licensure board, hospital, medical school, health care facility or entity, peer review or professional review committee or body, or governmental agency; (iii) nor any investigation or proceeding, whether administrative, civil or criminal, relating to an allegation against Physician of filing false health care claims, violating anti-kickback laws, engaging in billing improprieties or any fraudulent activities.  Should any of the foregoing change during employment under this Agreement, Physician shall immediately notify Group in writing.

Afrah Talpur, M.D.   Physician Employment Agreement
Page 4 of 19

j.  <u>Duty to Promote</u>.  Physician is obligated to promote, as and to the extent permitted by applicable law and the applicable cannons of professional ethics, the medical practice of Group and its affiliates, and to use diligent efforts to attract new patients to Group and its affiliates, develop professional referral relationships, expand Group and its affiliates' geographic patient base, enhance the reputation of Group and affiliates, deliver optimal medical care to the patients of Group and its affiliates and assure the efficient and effective administration of Group and its affiliates.

k.  <u>Intellectual Property</u>.  Physician acknowledges and agrees that intellectual property created by Physician through or as part of employment hereunder belongs to Group, including intellectual property derived from data and/or any other form of information belonging to Group or its affiliates.  Any intellectual property Physician creates or develops personally outside the scope of employment hereunder and without use of Group or PSH resources shall be retained and owned solely by Physician, but must be disclosed to Group consistent with the exclusive employment obligation hereunder.

l.  <u>Conflicts of Interest</u>.  Physician agrees to promptly report any conflict of interest or potential conflict of interest Physician may have with Group or its affiliates and/or the existence of any influence adversely affecting Physician's decision-making process pertaining to the performance of Physician's duties as set forth herein.  A Conflict of Interest ("COI") exists if there is a significant financial interest, opportunity for tangible personal benefit, and/or an obligation (including competitive obligations) that may exert a substantial and improper influence upon Physician; and/or when there is a divergence between the private interests of Physician and the Physician's obligation to research participants, patients, or to Group and/or its affiliates.  Physician acknowledges that this definition is merely a summary of COI, and is in addition to various conflict of interest and outside activities/outside work policies, to which Physician is subject.

4.  **<u>Group's Duties and Responsibilities</u>**.

a.  <u>Respect Medical Judgment</u>.  Group shall at all times respect Physician's independent medical judgment and control over Physician's professional medical services. At no time shall Group knowingly issue to Physician any direction or impose any requirement that would require Physician to violate professional ethics or mandates of Physician's profession.

b.  <u>Compensation and Benefits</u>.  In consideration of Physician's performance as required by this Agreement, Group shall pay Physician the compensation set forth in ***Exhibit A,*** attached and made a part of this Agreement, subject to all applicable withholdings.  Group reserves the right to offset amounts owing to Physician against any amounts owed by Physician to Group and Physician agrees that Group may withhold compensation to cover any such amounts.  No failure by Group to exercise any right of set-off hereunder shall prejudice or constitute a waiver of any other right or remedy Group may have against Physician arising out of any breach by Physician of this Agreement.  Group will provide the benefits as described to Physician, which are generally provided to all physicians employed by Group, and which are dependent upon Physician's FTE commitment/status.  Group reserves the right to modify benefits from time to time upon reasonable advance notice to Physician.  Physician agrees that, notwithstanding anything to the contrary in this Agreement, its exhibits and schedules, or any Group policy, rule, regulation or protocol, Group shall not be obligated to pay and Physician

Afrah Talpur, M.D.   Physician Employment Agreement
Page 5 of 19

shall not accept any compensation or incentive payment if such payment would violate any applicable law or regulation or result in a financial relationship that does not meet an exception to the Stark Law.  Unless otherwise expressly defined, or agreed to by the parties in writing, the term "wRVU" as used herein shall mean a Work Relative Value Unit recognized by the Center for Medicare & Medicaid Services (CMS).  Additionally, "wRVU" shall only include those "personally performed" by Physician, as that term is defined by statute, regulation, rule, policy and/or written agreement (including but not limited to agreements with payors), and shall exclude (i) any amounts in which Physician would be excluded by statute, regulation, rule, policy, and/or written agreement from participating; and (ii) shall also exclude those wRVUs which are not billable and payable due to Physician's failure, in whole or in part, to prepare, submit and/or process appropriate documentation.  Physician's credit for wRVUs is governed by policy and protocol, which is subject to change from time-to-time by Group.  Physician acknowledges that Physician is an "exempt" employee and not eligible for overtime compensation.  In this regard, while certain activities and duties herein are tracked and/or described in terms of time worked (hours, shifts, etc.), such measurements are not directly related to Physician's base compensation.  Where any aspect of the base compensation references time worked, it is for purposes of, *inter alia,* complying with various regulatory requirements, ensuring clinical coverage, and compiling workforce data.

c.    Incentive Compensation Payout.  Unless otherwise expressly set forth herein (or in any exhibit), no incentive compensation will be paid unless Physician is employed by Group and in good standing as of the time of payment (hereinafter, "incentive compensation").  However, Physician shall remain eligible for applicable incentive compensation, even if not employed at the time of payment, only where Physician (1) has deceased, (2) suffers a Total Disability (as defined by Group's applicable long term disability insurance plan documents or equivalent document), or (3) retires consistent with the Group's retirement policy/protocol.  In the case of death, Total Disability, or retirement, the applicable incentive compensation shall be prorated.

d.    Changes in Compensation.

(i)    Group will reevaluate and adjust Physician's compensation in the event that Group reasonably anticipates that Physician's work effort will fail to materially meet the expectations set forth in, *inter alia*, Exhibit A (for example, wRVU Target(s) (if any), scheduled shifts/time (if any), and/or FTE commitment).  This subsection (i) is intended to protect Group from paying Physician a compensation amount based upon productivity and/or FTE commitment which Physician is failing to materially meet.  Any adjustment to compensation made under this subsection (i) shall be made prospectively only, shall be proportionate, and will follow reasonable notice to Physician by Group of performance deficiencies.  Physician's compensation may also be reduced where Physician takes extended periods of leave, such as leave under the Family and Medical Leave Act, etc.  Only if applicable, Group may also need to reconcile past incentive compensation (but not base compensation) where Physician fails to meet productivity or performance metrics (such as wRVU productivity targets, and/or excess, additional, or bonus shift requirements) and will work with Physician in good faith to schedule repayments so as to minimize negative effects on Physician.

Afrah Talpur, M.D.   Physician Employment Agreement
Page 6 of 19

(ii)    Group shall also have the discretion and right to conduct an internal audit of Physician's records to ensure that the applicable standards for medical necessity and accurate coding have been met.  As part of this audit, Group shall have the right to adjust Physician's compensation as it relates to Physician's failure to comply with any and all legal requirements, regulations, or other binding authority, and to recover compensation that was paid to Physician based upon Physician's violations of such legal requirements, regulations, or other binding authority.

(iii)    Any and all productivity requirements (including wRVU Target(s), scheduled shifts/time, other metrics, as applicable) and/or conversion factors identified herein (including Exhibit A) and/or in any applicable compensation plans are subject to change by Group following reasonable notice to Physician.

e.    CME Reimbursement and Relocation.  Group will reimburse Physician for approved Continuing Medical Education ("CME"), and other related items (such as professional journal subscriptions, etc.), pursuant to Group's policies (at the time this Agreement was offered, the maximum was $4,000 per Fiscal Year, subject to proration).  At the time of this Agreement and with a .5 FTE, Physician would be entitled to $1750 per Fiscal Year.  Physician may be eligible for relocation assistance pursuant to Policy HR 37, to the extent the mileage requirements are satisfied, and up-to the dollar amount limits set forth therein.  Please consult Policy HR37 for further details.

5.    **Insurance.**  During the Term of this Agreement, Group shall obtain and maintain, at its expense, professional liability (malpractice) insurance coverage that covers Physician, without interruption, for professional medical services to be furnished by Physician hereunder, in such amounts as may be required by law or reasonably specified by Group from time to time.  Upon termination of this Agreement, Group shall provide tail insurance covering Physician's professional services provided pursuant to this Agreement, for claims within Physician's approved scope of practice.  Group will not provide any insurance coverage for services provided by Physician which are outside of the scope of this Agreement, including outside activities (as addressed further in Exhibit A); nor will Group provide insurance coverage for services provide before or after the term of this Agreement (unless provided under a separate employment agreement with Group).  Physician shall at all times during the Term be and remain insurable for professional liability (malpractice) coverage, at rates reasonably equivalent to those available with respect to other physician employees of Group (or otherwise as reasonably determined by Group), allowing for normal rate differentials among specialties; with such policy limits and subject to such deductibles and retentions as Group, in its sole discretion, determines to be reasonable and prudent for the protection of Group and Physician, but not less than as required by law.

6.    **Billing.**  Group shall be exclusively responsible for billing all patients and third party payors with respect to professional medical services rendered by Physician under this Agreement.  All fees or other income from any source attributable to the services rendered by Physician under this Agreement shall be the sole property of Group, and Physician assigns the same to Group.  Physician shall cooperate with and assist Group (or Group's designee) in the preparation of any and all financial, billing, and insurance records or reports and/or similar documents.  Physician shall not receive or negotiate checks or payments attributable to the services rendered by Physician under this Agreement.  Should Physician receive directly any

checks or payments which should have been sent to Group in accordance with this Agreement, Physician shall promptly deliver and assign to Group.

7.    **Term and Termination**.

a.    <u>Term</u>.  Subject to earlier termination as set forth in this Agreement, the term of this Agreement shall be for three (3) years, which shall begin on the Start Date (the "Initial Term").  This Agreement shall automatically extend for successive one (1) year periods (each is a "Renewal Term") unless the Agreement has been earlier terminated as provided for herein.  The Initial Term and each Renewal Term are collectively and individually sometimes referred to as the "Term."  For purposes of this Agreement, all references to "Contract Year" shall refer to each twelve (12) month period commencing on the Start Date.  "Fiscal Year" shall mean the period of July 1st through June 30th.

b.    <u>Termination by Group</u>.  Group may at its option terminate this Agreement <u>immediately</u> upon the occurrence of any of the following:

(i)    Any of Physician's representations, warranties or covenants set forth in Section 3 are no longer true, correct, or complete and Physician fails to cure such breach to the reasonable satisfaction of Group within thirty (30) days of becoming aware of such breach; provided, that Physician shall only have the right to cure if the breach is inadvertent and administrative and is reasonably curable within thirty (30) days;

(ii)    Physician's license to practice medicine in the Commonwealth of Pennsylvania is suspended, placed on a probationary status, curtailed or revoked, regardless of the pendency of any appeal;

(iii)    Physician's medical staff membership or clinical privileges at any hospital are, for any reason related to quality or behavior, terminated, suspended (including a summary suspension), or otherwise limited in any manner, including if voluntarily limited;

(iv)    Physician is expelled, suspended, or other disciplinary action is imposed upon Physician by a professional medical organization as a result of professional misconduct, or resignation by Physician from any professional medical organization under threat of disciplinary action for professional misconduct;

(v)    Physician fails or is unable to qualify or continue eligibility for professional liability insurance generally consistent with the terms of other physicians practicing in Physician's specialty in central Pennsylvania;

(vi)    Physician is indicted on any felony or a misdemeanor charge relating to the practice of medicine or an act considered a violation of moral conduct;

(vii) Physician enters into a consent decree or other judicial order or administrative settlement with respect to fraud, abuse or similar activities that are criminally or civilly proscribed;

(viii) Gross inattention or willful neglect of Physician's duties;

(ix)  Physician becomes an Impaired Professional (defined as (1) having an addictive disease or any other limitation that, in Group's reasonable judgment, could impair Physician's ability to perform Physician's duties under this Agreement _and_ for which Physician is not pursuing appropriate treatment (and other potential requirements under the Americans with Disabilities Act and similar laws); or (2) having diverted a controlled substance; or (3) being incompetent to practice medicine at a level that meets the minimum requirements of licensure), or Physician engages in drug or alcohol abuse, or the performance of medical services while under the influence of alcohol, illegal drugs, or impairing substances;

(x)  Physician jeopardizes the health or safety of patients, employees, or visitors, as reasonably determined by Group;

(xi)  Any theft of Group property by Physician, redirection of patients by Physician in violation of Section 8 and/or 9, misappropriating Group's cash, funds, supplies or equipment, or other similar act or activity; or

(xii) Failure by Physician to comply with any other material term and/or condition of this Agreement or of a material term of any policy or procedure as set forth by Group.

c.       Termination by Physician.  Physician may terminate this Agreement immediately upon the material breach by Group of its responsibilities hereunder, provided that Group has failed to cure any breach within thirty (30) days following written notice by Physician to Group, identifying it as a breach of this Agreement with particularity.

d.       Termination Without Cause.  Either party may terminate this Agreement without cause at any time, for any reason or no reason, following one-hundred and eighty (180) days' advanced written notice to the other party.

e.       Termination on Disability or Death. This Agreement shall automatically terminate if Physician suffers a "Total Disability" (as defined in Group's policies and/or benefit plan and in accordance with the Americans with Disabilities Act), effective as of the date determined pursuant to Group's policies and/or benefit plan, or upon Physician's death.

f.       Return of Property.  Promptly upon Physician's cessation of employment with Group at any time and for any reason, or at any other time Group may so direct, Physician shall immediately deliver to Group all of the property, records, and files of Group.  Upon returning such property, records, and files to Group, Physician shall permanently destroy any copies, whether in electronic form or otherwise, of all such property, records, and files in Physician's possession.

g.       Cooperation Upon Termination.  In the event of the expiration or termination of this Agreement for any reason, Physician shall cooperate with Group to assure the orderly transfer of patients treated by Physician during the Term of this Agreement to other physicians employed by Group or Group's affiliates, as designated by Group.  Physician's cooperation shall include, without limitation, taking all steps necessary or convenient to enable Group to effect an orderly transfer of information pertaining to patients that have been treated by Physician during Physician's term of employment and to obtain reimbursement for services rendered.  Physician

and Group shall each cooperate with the other in the defense of any claims (including litigation) arising out of the performance by Physician of Physician's duties during the Term.  Group will be exclusively responsible for providing notice to patients of Physician's transition.  Notwithstanding the foregoing, Group agrees to cooperate with Physician upon Physician's separation from employment to avoid any claims by patients against Physician regarding patient abandonment.

h.        Medical Staff Privileges upon Termination.  Upon separation from employment with Group, regardless of reason, Physician agrees to resign privileges at any and all Facilities, and other hospitals and healthcare facilities where Physician provided services under this Agreement, unless otherwise agreed to by the parties. Such resignation or termination of medical staff privileges, and the application therefor, will not be subject in any manner to, and the Physician hereby waives Physician's right to, any review or hearing, by a court or other body, or any other due process rights, including, but not limited to, any rights under the medical staff bylaws of any Facility, hospital or other health care facility.  Physician irrevocably appoints the acting President or any Vice President of the Group as Physician's attorney-in-fact to submit such resignations on Physician's behalf if Physician fails to do so within 72 hours after such resignation or termination. Such appointment is hereby coupled with an interest. Physician will be obligated to defend, indemnify and hold Group, the President of the Group or such other officer so acting as attorney-in-fact harmless and hereby releases them from any liability for acting as Physician's attorney-in-fact.

i.        Notice Requirements and Damages.  Physician's failure to provide the termination notice(s) as provided for herein shall constitute a material breach, which may create damages and harm Group.  Physician shall be liable for such damages and harm, including but not limited to costs and expenses incurred by Group for temporary physicians/locum tenens related to Physician's breach, and may result in Physician being identified by Group as ineligible for rehire with Penn State Health.  Damages and harm under this subsection are separate and distinct from those set forth in Section 8 below, and are not limited thereby.

**8.        Confidentiality, Non-Competition, Non-Solicitation and Non-Disparagement**.

a.        Confidentiality.  During the Term, Physician shall have access to Group and Group's affiliates' confidential and proprietary information as defined below.  Physician recognizes and acknowledges that all of such confidential and proprietary information shall remain confidential and shall remain the sole property of Group.  For purposes of this Agreement, the terms "confidential and proprietary information" includes, without limitation, Group and Group's affiliates' trademarks, service marks, patient lists, patient records (including those generated by Physician for Group/affiliate), computer programs, business strategies for developing new patient and new physician relationships, including physician recruitment cost data, utilization review techniques, medical management, quality assurance protocols, patents, trade secrets, know-how and other proprietary processes, and such proprietary information included in manuals or memoranda, as they may now exist or may be developed during the Physician's employment.  Physician shall not, during or after the Term, in whole or in part, disclose such confidential and proprietary information to any person or entity for any reason or purpose whatsoever unless required to do so by legal process (in which case Physician shall provide written notice to Group in advance of any disclosure), nor shall Physician make use of any such property for Physician's own purposes or for the benefit of any person, or entity (except

Group and Group's affiliates) under any circumstances during or after the Term. In furtherance of the foregoing and not in limitation thereof, during or after the Term, Physician shall not remove, copy, summarize, distribute or use patient records of Group and Group's affiliates except to perform Physician's duties hereunder. If a patient requests the transfer of their records in writing, Group shall process such request in accordance with Group's usual policies and procedures and applicable law.

b.      Non-Competition. Except with the prior written consent of Group, for a period of twenty-four (24) months following the expiration or termination of this Agreement for any reason (the "Restricted Period"), Physician (or any entity owned by Physician) shall not directly or indirectly (as owner, proprietor, partner, stockholder, principal, agent, broker, director, manager, representative, landlord, tenant, employee, consultant, lender, participant or any other capacity whatsoever), engage in the practice of medicine within the Restricted Territory (as hereinafter defined). "Restricted Territory" means the geographic area within a twenty-five (25) mile radius of any office or facility location where Physician has spent twenty percent (20%) or more of Physician's clinical time during the twelve (12) month period immediately preceding separation from employment. This restriction applies not only to any office Physician may seek to establish for the practice of medicine, but also to medical staff memberships and/or the exercise of clinical privileges at any health care facility located in the Restricted Territory. Relating to telehealth and/or virtual health services, for purposes of this Section, "any office or facility location" (as used above) shall also include the physical locations in Pennsylvania from which any virtual and/or telehealth services were provided under this Agreement. For purposes of determining Physician's compliance with this Section post-employment, the "engage[ment] in the practice of medicine" (as used above) shall include the location of the patient (or recipient of the telehealth or virtual service) at the time the virtual or telehealth services are/were received.

c.      Non-Solicitation. Physician agrees that during the Term and for a period of twelve (12) months after the expiration or termination of this Agreement for any reason, Physician shall not, directly or indirectly, on Physician's own behalf or on behalf of any other person, organization or entity, individually or collectively, in any fashion, form or manner, without Group's prior written consent: (i) solicit any patient of Group or Group's affiliates; (ii) send announcements or publications regarding new offices or employment affiliations; (iii) employ, engage, contract in any manner for the services of, induce or solicit the services of any of the employees of Group or Group's affiliates to work for Physician or any person, corporation, partnership, sole proprietorship, governmental agency, organization, joint venture or other entity with whom or which Physician is associated, or (iv) induce or attempt to influence any individual or organization that has a contractual relationship with Group or Group's affiliates (including but not limited to any hospital, third party payer, health care purchasing organization, managed care organization or any other individual or organization), or any physician with a referring relationship with Group or Group's affiliates, to reduce, limit or terminate such relationship. For the purposes of this section, "patient of Group or Group's affiliates" shall mean any patient who received services and/or had a scheduled appointment for services with Group or any affiliate in the twenty-four (24) months preceding the expiration or termination of this Agreement, and "employees of Group or Group's affiliates" shall mean any employee who was employed by Group or any affiliate for any portion of the twelve (12) months preceding the expiration or termination of this Agreement.

d.       Non-disparagement.  Physician covenants and agrees that during the term of this Agreement and at all times thereafter, Physician shall not directly or indirectly, in any fashion, form or manner (including, but not limited to, any form or manner or electronic communication or through any electronic communication device), disparage or otherwise make or publish written or oral statements or remarks about the Group, or any of the Group's past or present affiliates, officers, directors, and employees and agents, that reasonably may be considered derogatory, disparaging, deleterious or detrimental to the Group's integrity, reputation or goodwill (including, without limitation, the repetition or distribution of derogatory rumors, allegations, remarks and/or negative reports or comments), including but not limited to any statements or remarks on social media.  This provision shall not apply and otherwise limit Physician's testimony in response to a subpoena or similar legal compulsion from a court or government agency of/with competent jurisdiction, nor shall it apply in any other circumstance limited by law; but any disclosure under these exceptions to the non-disparagement obligation require advanced notice to Group.

e.       Blue-Pencil Provision and Severability.  In the event any of the provisions of this Section 8 are declared by a court of competent jurisdiction to exceed the time, geographic, occupational or other limitations permitted by applicable law, then such provisions shall be deemed reformed to the maximum time, geographic, occupational or other limitation held reasonable and enforceable by such court.  Likewise, if Physician is found by a court, arbitrator, or similar tribunal to have violated any provision within Section 8, then the Restricted Period shall be extended for the same period of time as the violation to ensure that Group and/or Group's affiliates enjoy the full duration of the Restricted Period.  The provisions of this Section shall be independent of any other provision of this Agreement, and the existence of any claim or cause of action by Physician against Group and/or Group's affiliates, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of this Section by Group and/or Group's affiliates.

f.       Remedies.  Physician acknowledges that a breach by Physician of the covenants and agreements contained in this Section 8 shall cause immediate and irreparable harm to Group and/or Group's affiliates, the amount of which would be difficult to ascertain, and that Group and/or Group's affiliates could not be adequately compensated by damages in an action at law.  For these reasons, Group and/or Group's affiliates shall have the right to obtain such preliminary, temporary or permanent injunctions, orders or decrees as may be necessary to protect Group and/or Group's affiliates against, or on account of, any breach by Physician of the provisions of Section 8 hereof, without the necessity of posting any bond or surety.  If a bond is required, then a cash bond of $1,000 shall be sufficient.  The rights and remedies of Group under this Agreement are cumulative and are in addition to all other rights and remedies Group may have under any local, state or federal law, rule or regulation or otherwise.  Such right to equitable relief shall be in addition to all other legal and equitable remedies which Group and/or Group's affiliates may have to protect its/their rights.  For any legal actions taken by Group and/or Group's affiliates against Physician involving this Section 8, or any other section in this Agreement or its attachments, regardless of whether litigation is formally commenced, Physician shall be liable for any and all attorneys' fees and costs incurred by Group.  Group reserves the right to enforce the provisions of Section 8 selectively against Physician, and as such Physician agrees not to raise any legal claim related to such selective enforcement.

g.    <u>Third Party Beneficiary and Survivability</u>.  Each affiliate of Group shall be a third party beneficiary with respect to this Section 8 and shall have the right to enforce such provisions against the Physician.  The terms of this Section 8 shall survive termination or expiration of this Agreement for any reason.

9.    **Coordination of Care.**  In order to promote the delivery of quality, coordinated, efficient, cost-effective care for patients of Group, Physician agrees, for all patients receiving care under this Agreement, to utilize services available from Group or its affiliates, except when (a) the use of a different provider is required by the terms of a patient's enrollment or participation in an insurance or other health care plan or as required by law, (b) Physician determines that the use of a Group-affiliated provider to provide such services is not in the best medical interests of the patient, (c) the patient requests to use a different provider, (d) Group-affiliated providers do not offer the needed services or such services are not convenient to the patient either in terms of geography or availability or would create a financial hardship for the patient, (e) medical emergency requires otherwise, or (f) a referring physician from another system desires patient referrals back to that system in order to coordinate the patient's care.

10.    **Notices**.  All notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given upon personal delivery; or twenty-four (24) hours following deposit for overnight delivery with a bonded courier holding itself out to the public as providing such service, or following transmission by email or electronic facsimile, if subsequently mailed as provided herein; or forty-eight (48) hours following deposit in the U.S. Mail, registered or certified mail, postage prepaid, and in any case addressed as follows, or to such other addresses as the parties may designate from time to time:

        If to Physician:              [Address set forth on signature page]

        If to Group:                St. Joseph Medical Group
                                    c/o Penn State Health
                                    500 University Drive
                                    PO Box 850
                                    MC CA 210
                                    Hershey PA  17033
                                    Attn:   Chief Operating Officer

11.    **Miscellaneous**.

        a.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument. The exchange of signatures and copies of this Agreement transmitted by facsimile or in .pdf format by electronic means shall be deemed to be original signatures for all purposes.

        b.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania applicable to agreements made and to be performed wholly within that state, irrespective of such state's choice-of-law principles.  Any action seeking to enforce any provisions of, or based on any right arising out of, this Agreement shall be brought against any of the parties only in the courts of Dauphin County,

Commonwealth of Pennsylvania, or, if it has or can acquire the necessary jurisdiction, in the United States District Court for the Middle District of Pennsylvania, and each of the parties consent to the jurisdiction of such courts (and of the appropriate appellate courts). In any action brought by or through this Agreement, both parties irrevocably waive any objections to venue and also waive any bond, surety or other security that might be required of any other party with respect thereto.

c.    Partial Invalidity and Interpretation.  If any provision of this Agreement is found to be invalid or unenforceable by any court or other lawful forum, such provision shall be ineffective only to the extent that it is in contravention of applicable laws without invalidating the remaining provisions of the Agreement, unless such invalidity or unenforceability would defeat an essential business purpose of the Agreement.  The headings, titles of sections and paragraphs, etc., of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to such.  Moreover, this Agreement shall not be construed against either Party as the author or drafter of the Agreement.

d.    Waiver.  No waiver of or failure by either party to enforce any of the provisions, terms, conditions, or obligations herein shall be construed as a waiver of any subsequent breach of such provision, term, condition, or obligation, or of any other provision, term, condition, or obligation hereunder, whether the same or different in nature.  No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

e.    Amendments.  This Agreement may be amended at any time by mutual agreement of the parties without additional consideration, provided that, before any amendment shall become effective, it shall be reduced to writing and signed by each of the parties.

f.    Entire Agreement.  This Agreement (including any attached exhibits and schedules) contains the entire agreement between the parties concerning the subject matter of this Agreement, and supersedes all other and prior terms, covenants, representations, and agreements, whether oral or written.  This Agreement shall not, however, supersede any prior loan agreements or arrangements between the parties, as it relates exclusively to the loan or advancement of money or compensation by Group or Group's affiliates to Physician, unless otherwise expressly set forth herein.

g.    Change in Law.  Notwithstanding anything herein to the contrary, if during the Term hereof any Change of Law results in an Adverse Consequence (as such terms are hereinafter defined), the parties agree to cooperate in making reasonable revisions to this Agreement in order to avoid such Adverse Consequence.  If the Parties through good faith negotiations fail to agree or object to such revisions after thirty (30) days following written notice by either Party to the other Party, then this Agreement may be immediately terminated by a Party upon written notice to the other Party.  As used in this section, "Change in Law" shall mean: (i) any new legislation or change in existing legislation enacted by the Federal or any State or local government; (ii) any new or modified third party payor or governmental agency law, rule, regulations or guideline; (iii) any judicial or administrative order, decree or decision; or (iv) any interpretation of (i), (ii), or (iii) above, by a court of competent jurisdiction, by the Office of Inspector General, or by a formal written opinion issued by legal counsel to Group or Group's affiliates or the Physician.  As used in this section, "Adverse Consequence" shall mean a Change

of Law that prohibits, restricts, limits or otherwise adversely affects either Party's rights or obligations hereunder in a material manner or otherwise makes it desirable for the Parties to restructure the relationship established hereunder because of adverse material legal or financial consequences expected to result from such Change of Law.

12.     **Assignment.**  Physician may not assign Physician's rights or obligations under this Agreement. Group may assign this Agreement, in whole or in part, including but not limited to the restrictive covenants, to any subsidiary, affiliate or successor in interest which may assume responsibility for continued operations.

13.     **Confidentiality of Terms.**  Physician agrees to keep the terms and conditions of this Agreement confidential, and shall not disclose such terms and conditions without the written consent of Group to any person or entity other than Physician's attorney, accountant or immediate family member, all who must have a business need to know, except only as Physician may be required by law or court order to disclose such matters.  Physician and Physician's agents shall not discuss or disclose the terms and conditions of this Agreement with any other past, present or future employee of Group or an affiliate thereof at any time. If Physician must disclose portions of this Agreement to a prospective employer, only those Sections that must be disclosed may be shared (such as Section 8), and all other Sections must be redacted or withheld from disclosure.

**IN WITNESS WHEREOF**, the parties hereto have executed this Employment Agreement as of the dates listed below:

**PHYSICIAN:**

Signed by:

_____
9D4E02A925AC441...

**Afrah Talpur, M.D.**

Address:

_____
222 winged foot dr

_____
blue bell pa 19422

Date:_____
9/9/2024 | 12:30 PM PDT

**GROUP:**

Signed by:

By: _____
kimberly Wolf
450574704CFC4D0...

**Kimberly Wolf, D.O.**

**Vice President of Medical Affairs**

Date:_____
9/9/2024 | 4:22 PM EDT

**EXHIBIT A**
**COMPENSATION**

## SIGN-ON BONUS

Group shall pay Physician, no sooner than 90 days before the Start Date, advance compensation in the form of a loan to Physician in the gross sum of **$20,000** (the "Loan"), less applicable withholdings. The Loan will be forgiven in its entirety following 24 months of employment with Group under this Agreement, as measured from the Physician's Start Date (the "forgiveness period"). Physician will thereafter have no repayment obligation with respect to the Loan. The Loan is income when paid, and will be reported as income in the year received via IRS form W-2. In the event that Physician fails to commence employment on the scheduled Start Date (as may be mutually rescheduled by the Parties), and/or fails to maintain employment for the forgiveness period set forth above, Physician agrees to repay to Group the total amount of the Loan within 30 days of the termination/separation date. In the event of repayment, a corrected W-2 may be necessary, and will be issued by Group consistent with tax requirements. To the extent Group must take legal action to recover the Loan (in full or in part), Physician shall be responsible for all legal fees and costs associated therewith. The Sign-on Bonus is considered "incentive compensation" as addressed herein.

## BASE AND INCENTIVE COMPENSATION

Group shall pay Physician the following compensation, based upon the fiscal Year, in accordance with Group's policies and procedures.

### Annual Base Salary: $132,500

Provided that Physician remains the same FTE and meets the work commitment (e.g., works the amount of Scheduled Time) set forth herein, Physician's total annual *Base Compensation* shall be **$132,500**.

### Quality Payment: Up to $10,000

Physician shall be eligible for an annual Quality Payment up-to $20,000, as described in a separate document or policy outlining quality metrics and requirements, which is subject to change from time-to-time. Group will provide Physician with advanced written notice of any changes in/to the quality goals.

### Compensation for Excess Time and Block Bonus

Due to the nature and role of hospitalist services, there may be times when Physician is required to work above and beyond the annual Scheduled Time (defined below). This additional time shall be referred to herein as "Excess Time." To ensure adequate and safe staffing and coverage levels, Physician will be obligated to work Excess Time when scheduled by Group, but shall receive **$155** per hour of Excess Time for day shifts, and **$160** for night shifts. However, the parties will work in good faith to ensure that Excess Time does not unreasonably interfere Physician's approved outside activities. Should Physician receive compensation for Excess Time which results in a net overpayment of Excess Time Compensation to Physician for any year (by

way of example, if Physician receives Excess Time in one or more quarters, but then fails to work the annual Scheduled Time before the end of the year), *and Physician separates from employment for any reason with that overpayment outstanding*, then Physician shall repay to Group the net Excess Time overpayment amount.

In addition, if Physician is scheduled to work Excess Time in the form of a night shift during a week when Physician is not scheduled to work, then Physician will receive a flat, per-night shift Block Bonus in the amount of a **$500**. This Block Bonus is in addition to the hourly Excess Time Compensation set forth above. Changes to the Excess Time compensation and Block Bonus amounts and payment methods are subject to change following advanced notice to Physician.

Group will work with the Hospitalists as a group to assign/schedule this time in a reasonable and equitable manner. Excess Time and the Block Bonus compensation shall be considered Incentive Compensation, as addressed herein.

A 0.5 FTE physician will be scheduled to work **a total of 13 scheduled work weeks per year** (herein, "Scheduled Time"). The scheduling method is subject to change upon reasonable notice to Physician. Scheduled Time does not include Physician's obligations regarding charting, administrative time, CME and other time worked. Incentive compensation for Excess Time is addressed above. Physician will not receive paid time off, but rather, is free to schedule time off in advance, when patient care requirements and service coverage permits, as processed and approved under Group's policies, and which will not affect Physician's Base Salary Draw.

### Productivity Bonus

Physician may earn a Productivity Payment, as described below. The Productivity Payment shall be calculated using a per-wRVU rate for each wRVU (the "Conversion Factor") for each wRVU produced in excess of the Quarterly wRVU Target. The Quarterly wRVU Target is a quarter (one-fourth) of the Annual wRVU Target identified below. This Quarterly wRVU Target shall change based upon the Annual wRVU Target, which is subject to change by Group following advanced notice to Physician. The Conversion Factor at the time this Agreement was entered into was $70.89, and like the Annual wRVU Target, is subject to change by Group following advanced notice to Physician. The Annual Productivity Payment limit shall be applied on a quarterly basis.

The Annual wRVU Target is 2,010 (or 502.5 quarterly), and the Annual Productivity Payment Limit is $32,500 (or $8,125).

### OUTSIDE CLINICAL SERVICES

All opportunities for Physician to perform services outside of this Agreement which are related to the practice of medicine (in which Physician uses his/her medical degree and knowledge) must first be approved by Group, regardless of whether such services generate income. Requests to perform such outside services will be reviewed and either approved or denied by Group under applicable policy.

Group has reviewed and approved Physician's outside activities as listed in ***Exhibit B*** hereto (if any). Should Group determine at a later date that the approved outside activities present a conflict of interest and/or are otherwise inconsistent with Physician's employment under this Agreement (as outlined in applicable policy), Group may terminate Physician's employment without cause upon 30 days written notice.

## ADMINISTRATIVE COMPENSATION

Physician may be asked to perform administrative leadership functions. Group will address Physician Administrative roles and responsibilities and associated compensation on a case-by-case basis, should they arise.

Afrah Talpur, M.D.   Physician Employment Agreement
Page 18 of 19

# EXHIBIT B
## OUTSIDE ACTIVITIES
### (Only Complete if Applicable)

**For each outside activity listed below, a request form must be submitted to SJMG Leadership.**

| Title/Position | Employer/Entity | Brief description of the work being performed | Compensation (Total approx. annual amount, or if not known, hourly rate, fee, etc.). | Time Spent (approx. weekly or monthly time spent) |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Afrah Talpur, M.D.   Physician Employment Agreement
Page 19 of 19

**DocuSign**

## Certificate Of Completion

Envelope Id: 138C231B70F6494BA5905945F011A673
Subject: Complete with Docusign: Afrah Talpur -  SJMG Emloyment Agmt - Hospitalist - 9-3-2024.pdf
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 19 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | Sharon Ready |
| AutoNav: Enabled | | 500 University Drive |
| EnvelopeId Stamping: Enabled | | Hershey, PA  17033 |
| Time Zone: (UTC-05:00) Eastern Time (US & Canada) | | sready@pennstatehealth.psu.edu |
| | | IP Address: 150.231.246.19 |

Status: Completed

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Sharon Ready | Location: DocuSign |
| 9/3/2024 10:27:56 AM | sready@pennstatehealth.psu.edu | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Alfrah Talpur<br>afrahtalpur@yahoo.com<br>Security Level: Email, Account Authentication (None) | Signed by:<br>9D4E02A925AC441...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 100.14.166.45<br>Signed using mobile | Sent: 9/3/2024 10:56:19 AM<br>Resent: 9/9/2024 3:22:21 PM<br>Viewed: 9/9/2024 3:29:37 PM<br>Signed: 9/9/2024 3:30:46 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 9/9/2024 3:29:36 PM<br>ID: 0fc4ac75-ce2f-4883-b251-30d860eba069 | | |
| Kimberly Wolf<br>kwolf@pennstatehealth.psu.edu<br>Vice President, Medical Affairs<br>Security Level: Email, Account Authentication (None) | Signed by:<br>kimberly Wolf<br>450574704CFC4D0...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 150.231.246.17 | Sent: 9/9/2024 3:30:48 PM<br>Viewed: 9/9/2024 4:21:50 PM<br>Signed: 9/9/2024 4:22:55 PM |
| **Electronic Record and Signature Disclosure:**<br>Accepted: 9/9/2024 4:21:50 PM<br>ID: 90c825d5-cb2b-4d84-a701-2ef11e2aee29 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Jessica Daud<br>jdaud@pennstatehealth.psu.edu<br>Director Talent Acquisition - HR Provider Recruitment<br>Penn State Health Shared Services<br>Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 9/9/2024 4:22:56 PM |
| **Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | | |

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Joseph Oppold<br>joppold@pennstatehealth.psu.edu<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 9/9/2024 4:22:57 PM |
| alysson robitzer<br>adengler1@pennstatehealth.psu.edu<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Accepted: 5/9/2024 10:37:31 AM<br>ID: 57dd715b-8faa-4330-b5bb-abff69e993b7 | **COPIED** | Sent: 9/9/2024 4:22:58 PM |
| Heather Peffley<br>hpeffley@pennstatehealth.psu.edu<br>Security Level: Email, Account Authentication (None)<br>**Electronic Record and Signature Disclosure:**<br>Not Offered via DocuSign | **COPIED** | Sent: 9/9/2024 4:22:59 PM<br>Viewed: 9/9/2024 4:44:08 PM |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/3/2024 10:56:19 AM |
| Certified Delivered | Security Checked | 9/9/2024 4:21:50 PM |
| Signing Complete | Security Checked | 9/9/2024 4:22:55 PM |
| Completed | Security Checked | 9/9/2024 4:22:59 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 1/4/2024 8:45:25 AM
Parties agreed to: Alfrah Talpur, Kimberly Wolf, alysson robitzer

Case 5:26-cv-03573-JFL    Document 1    Filed 05/26/26    Page 34 of 39

**ELECTRONIC RECORD AND SIGNATURE DISCLOSURE**

From time to time, Penn State Health (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Penn State Health:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: sbechtold@pennstatehealth.psu.edu

**To advise Penn State Health of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at sbechtold@pennstatehealth.psu.edu and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Penn State Health**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to sbechtold@pennstatehealth.psu.edu and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Penn State Health**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to sbechtold@pennstatehealth.psu.edu and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Penn State Health as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Penn State Health during the course of your relationship with Penn State Health.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

| | | |
|---|---|---|
| Afrah Talpur | : | CIVIL ACTION |
| | : | |
| v. | : | |
| St. Joseph Regional Health Network d/b/a Penn State Health | : | |
| St. Joseph d/b/a St Joseph Medical Center, et al. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
 and Human Services denying plaintiff Social Security Benefits.                                     ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.      ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
 exposure to asbestos.                                                                             ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
 commonly referred to as complex and that need special or intense management by
 the court.  (See reverse side of this form for a detailed explanation of special
 management cases.)                                                                                ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.                 (x )

| 5/26/2026 | | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-639-0801 | 215-639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

**(Civ. 660) 10/02**

10/2024

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### DESIGNATION FORM

Place of Accident, Incident, or Transaction:  Defendants place of business

---

***RELATED CASE IF ANY:***   Case Number:_____   Judge:_____

1.  Does this case involve property included in an earlier numbered suit?    Yes ☐

2.  Does this case involve a transaction or occurrence which was the subject of an earlier numbered suit?    Yes ☐

3.  Does this case involve the validity or infringement of a patent which was the subject of an earlier numbered suit?    Yes ☐

4.  Is this case a second or successive habeas corpus petition, social security appeal, or pro se case filed by the same individual?    Yes ☐

5.  Is this case related to an earlier numbered suit even though none of the above categories apply? If yes, attach an explanation.    Yes ☐

I certify that, to the best of my knowledge and belief, the within case ☐ **is** / ☒ **is not** related to any pending or previously terminated action in this court.

---

**Civil Litigation Categories**

**A.** *Federal Question Cases:*

☐ 1.  Indemnity Contract, Marine Contract, and All Other Contracts)
☐ 2.  FELA
☐ 3.  Jones Act-Personal Injury
☐ 4.  Antitrust
☐ 5.  Wage and Hour Class Action/Collective Action
☐ 6.  Patent
☐ 7.  Copyright/Trademark
☐ 8.  Employment
☐ 9.  Labor-Management Relations
☒ 10.  Civil Rights
☐ 11.  Habeas Corpus
☐ 12.  Securities Cases
☐ 13.  Social Security Review Cases
☐ 14.  Qui Tam Cases
☐ 15.  Cases Seeking Systemic Relief **\*see certification below\***
☐ 16.  All Other Federal Question Cases. *(Please specify)*:_____

**B.** *Diversity Jurisdiction Cases:*

☐ 1.  Insurance Contract and Other Contracts
☐ 2.  Airplane Personal Injury
☐ 3.  Assault, Defamation
☐ 4.  Marine Personal Injury
☐ 5.  Motor Vehicle Personal Injury
☐ 6.  Other Personal Injury *(Please specify)*:_____
☐ 7.  Products Liability
☐ 8.  All Other Diversity Cases:  *(Please specify)*_____
_____

I certify that, to the best of my knowledge and belief, that the remedy sought in this case ☐ **does** / ☒ **does not** have implications beyond the parties before the court and ☐ **does** / ☒ **does not** seek to bar or mandate statewide or nationwide enforcement of a state or federal law including a rule, regulation, policy, or order of the executive branch or a state or federal agency, whether by declaratory judgment and/or any form of injunctive relief.

---

### ARBITRATION CERTIFICATION (CHECK ONLY ONE BOX BELOW)

I certify that, to the best of my knowledge and belief:

☒  Pursuant to Local Civil Rule 53.2(3), this case is not eligible for arbitration either because (1) it seeks relief other than money damages; (2) the money damages sought are in excess of $150,000 exclusive of interest and costs; (3) it is a social security case, includes a prisoner as a party, or alleges a violation of a right secured by the U.S. Constitution, or (4) jurisdiction is based in whole or in part on 28 U.S.C. § 1343.

☐  None of the restrictions in Local Civil Rule 53.2 apply and this case is eligible for arbitration.

NOTE: A trial de novo will be by jury only if there has been compliance with F.R.C.P. 38.

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| WEAVER, YVONNE | LANKENAU MEDICAL CENTER, ET AL. |

| (b) County of Residence of First Listed Plaintiff **Montgomery** | County of Residence of First Listed Defendant **Montgomery** |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| (c) Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Ari R. Karpf, Esq.; Karpf, Karpf & Cerutti, P.C., 8 Interplex Drive, Suite 210, Feasterville-Trevose, PA 19053; 215-639-0801; akarpf@karpf-law.com | |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

[ ] 1 U.S. Government Plaintiff

[X] 3 Federal Question *(U.S. Government Not a Party)*

[ ] 2 U.S. Government Defendant

[ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | [ ] 625 Drug Related Seizure | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane    [ ] 365 Personal Injury - | of Property 21 USC 881 | [ ] 423 Withdrawal | [ ] 376 Qui Tam (31 USC |
| [ ] 130 Miller Act | [ ] 315 Airplane Product    Product Liability | [ ] 690 Other | 28 USC 157 | 3729(a)) |
| [ ] 140 Negotiable Instrument | Liability    [ ] 367 Health Care/ | | **INTELLECTUAL** | [ ] 400 State Reapportionment |
| [ ] 150 Recovery of Overpayment | [ ] 320 Assault, Libel &    Pharmaceutical | | **PROPERTY RIGHTS** | [ ] 410 Antitrust |
| & Enforcement of Judgment | Slander    Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers'    Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted | Liability    [ ] 368 Asbestos Personal | | [ ] 835 Patent – Abbreviated | [ ] 460 Deportation |
| Student Loans | [ ] 340 Marine    Injury Product | | New Drug Application | [ ] 470 Racketeer Influenced and |
| (Excludes Veterans) | [ ] 345 Marine Product    Liability | | [ ] 840 Trademark | Corrupt Organizations |
| [ ] 153 Recovery of Overpayment | Liability    **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets | [ ] 480 Consumer Credit |
| of Veteran's Benefits | [ ] 350 Motor Vehicle    [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle    [ ] 371 Truth in Lending | Act | | [ ] 485 Telephone Consumer |
| [ ] 190 Other Contract | Product Liability    [ ] 380 Other Personal | [ ] 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal    Property Damage | Relations | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | Injury    [ ] 385 Property Damage | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ |
| | [ ] 362 Personal Injury -    Product Liability | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | Leave Act | [ ] 864 SSID Title XVI | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights    **Habeas Corpus:** | [ ] 791 Employee Retirement | | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting    [ ] 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information |
| [ ] 230 Rent Lease & Ejectment | [X] 442 Employment    [ ] 510 Motions to Vacate | | [ ] 870 Taxes (U.S. Plaintiff | Act |
| [ ] 240 Torts to Land | [ ] 443 Housing/    Sentence | | or Defendant) | [ ] 896 Arbitration |
| [ ] 245 Tort Product Liability | Accommodations    [ ] 530 General | | [ ] 871 IRS—Third Party | [ ] 899 Administrative Procedure |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities -    [ ] 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | mployment    **Other:** | [ ] 462 Naturalization Application | | Agency Decision |
| | [ ] 446 Amer. w/Disabilities -    [ ] 540 Mandamus & Other | [ ] 465 Other Immigration | | [ ] 950 Constitutionality of |
| | Other    [ ] 550 Civil Rights | Actions | | State Statutes |
| | [ ] 448 Education    [ ] 555 Prison Condition | | | |
| |    [ ] 560 Civil Detainee - | | | |
| |    Conditions of | | | |
| |    Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

[X] 1 Original Proceeding

[ ] 2 Removed from State Court

[ ] 3 Remanded from Appellate Court

[ ] 4 Reinstated or Reopened

[ ] 5 Transferred from Another District *(specify)*

[ ] 6 Multidistrict Litigation - Transfer

[ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Title VII (42USC2000)

Brief description of cause:
Violations of Title VII/PDA, PHRA and Pennsylvania State and Common Law.

## VII. REQUESTED IN COMPLAINT:

[ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____ DOCKET NUMBER _____

DATE **5/26/2026**

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____